UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUDI HERRERA,<br><br>        Plaintiff,<br><br>  v.<br><br>CITY OF FREMONT, et al.,<br><br>        Defendants. | Case No. 18-cv-02843-JSC<br><br>**ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 51 |

     Rudi Herrera brings this civil rights action against the City of Fremont, Fremont Police Chief Richard Lucero, and several individual officers following his arrest on May 14, 2017. Plaintiff contends that officers violated his First, Fourth, and Fourteenth amendments rights as well as his rights under state law when they entered his home, detained, tased, and arrested him while responding to a domestic disturbance call. Defendants move for summary judgment.[1] (Dkt. No. 51.) Having considered the parties' arguments and having had the benefit of oral argument on November 7, 2019, the Court GRANTS IN PART and DENIES in part Defendants' motion for summary judgment. Disputes of fact preclude summary judgment on Plaintiff's excessive force claim against Officers Gerber, Gigliotti, and Francisco. The motion is otherwise granted.

## SUMMARY JUDGMENT EVIDENCE

     Rudi Herrera and his long-time domestic partner Melissa (Monique) Santellana hosted a Mother's Day barbeque at their residence on May 14, 2017. (Dkt. No. 51-13 (Herrera Depo.) at

---

[1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 7 & 11.)

112:7-11; 116:6-20; Dkt. No. 62-3 (Santellana Depo.) at 11:1-13:5.)  Both Mr. Herrera and Ms. Santellana's mothers attended as did Ms. Santellana sixteen year-old sister, Ellena, and Mr. Herrera's brother.  (Dkt. No. 51-13 at 116:8-117:15.)  Mr. Herrera and Ms. Santellana live with their three minor children who were also present.  (*Id*. at 123:19-20.)  Over the course of the afternoon, Ms. Santellana and her mother drank Jägermeister, and Mr. Herrera had a couple of beers while he was barbequing and possibly some Jägermeister.  (*Id*. at 121:9-15; 122-3-24; 182:21-22.)  At some point in the afternoon, Ms. Santellana and Mr. Herrera got into an argument, which extended to involve Ms. Santellana mother, and Mr. Herrera's mother.  Individual accounts of the dispute vary; however, the parties agree that at some point Ellena called 911.

Officers Gerber and Gigliotti were dispatched to the scene.  (Dkt. No. 51-18 (Gigliotti Depo.) at 19:7-10; Dkt. No. 51-19 (Gerber Depo.) at 19:9-11.)  When the officers arrived at the scene, Officer Gigliotti went to speak with Ellena and her mother who were out front.  (Dkt. No. 51-18 at 21:25-22:2.)  While Officer Gigliotti was speaking with Ellena and her mother, Officer Gerber walked towards the backyard and observed a shed with a broken door.  (Dkt. No. 51-19 at 25:7-20.)   The officers then approached the house, knocked repeatedly, and the door was ultimately opened by a woman who told them that her son and a woman had been fighting. (*Id*. at 29:22-23l 36:1-13; Dkt. No. 51-18 at 30:2-4.)

The parties' versions of events after the officers entered the house differ.  The officers detained Mr. Herrera and in the process of handcuffing him Officer Gerber deployed his taser twice.  The entire incident took under three minutes and was recorded on a cellphone.  (Dkt. No. 51-12 at Ex. P; Dkt. No. 62-1 at Ex. L.)  However, the cellphone video image is intermittently obscured and does not show the tasing.

After the officers handcuffed Mr. Herrera and led him out of the house, he was taken and placed in a squad car.  (Dkt. No. 51-18 at 74:4-10.)  Upon his removal from the squad car, Mr. Herrera testified that there was a second excessive force incident when Officer Francisco attempted to choke him while he was being transferred out of the handcuffs and into four-point restraints on a gurney. (Dkt. No. No. 62-2 at 166:10-169:6.)   Once he was restrained on the gurney, Mr. Herrera was taken to Washington Hospital for evaluation.  (Dkt. No. 51-13 at 172:12-

18.)  The taser prongs were removed at the hospital and Officers Gerber and Gigliotti then transported Mr. Herrera to Santa Rita Jail where he was booked and charged with violation of California Penal Code 243(e)(1) and 148(a)(1).  (*Id*. at 179:4-17, 180:13-14; Dkt. No. 51-18 at 75:22-23; Dkt. No. 62-10 at 15.[2])  The charges were ultimately dismissed. (Dkt. No. 62-2 at ¶ 2.)

## PROCEDURAL BACKGROUND

Plaintiff filed this civil action one year later against the City of Fremont, Fremont Police Chief Richard Lucero, Sergeant Little, Officer Joseph Gigliotti, Officer Robert Gerber, Officer Al Francisco, District Attorney James Meehan, and Alameda County Sheriff's Office employee D. Skoldqvist.  He pleads 11 claims for relief: (1) violation of his First, Fourth, and Fourteenth Amendment rights under 42 U.S.C. § 1983; (2) a *Monell* Section 1983 and supervisory liability claim; (3) a *Devereaux* Section 1983 claim; (4) a malicious prosecution Section 1983 claim; (5) violation of the California Constitution, Article I, § 13; (6) violation of California Civil Code § 52.1(b); (7) false arrest and false imprisonment; (8) assault and battery; (9) negligence; (10) invasion of privacy; and (11) intentional infliction of emotional distress.  (Dkt. No. 1.)  Plaintiff subsequently dismissed his claims against D. Skoldqvist and James Meehan.  (Dkt. No. 12.)  Plaintiff also dismissed his intentional infliction of emotional distress claim and his wage loss and loss of income claims. (Dkt. Nos. 48 & 57.)

On September 23, 2019, Defendants filed the underlying motion for summary judgment. (Dkt. No. 51.)  The motion is fully briefed and came before the Court for a hearing on November 7, 2019.[3]  Trial is scheduled to commence January 27, 2019.

## DISCUSSION

### I.  Plaintiff's Constitutional Claims

### A.       Plaintiff's Section 1983 Civil Rights Claim – First Claim

Plaintiff's first Section 1983 claim is predicated on a violation of his First, Fourth, and

---

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[3] Plaintiff filed an objection to Defendants' reply brief contending that it was untimely filed. (Dkt. Nos. 64 & 67.) However, based on the parties' stipulation, the reply brief was due on October 14, 2019, which is a federal holiday. (Dkt. No. 50.)  The filing date was thus extended to the following business day. *See* Fed. R. Civ. Pro. 6(a).

Fourteenth Amendment Rights. Essentially, Plaintiff alleges that Officers Gerber and Gigliotti unlawfully entered his home, that he was searched and arrested without probable cause, that the officers used excessive force to effectuate his arrest, and that the officers acted in retaliation for exercise of his First Amendment rights. Plaintiff also alleges that Sergeant Little unlawfully entered his home after his arrest. Finally, Plaintiff alleges that Officer Francisco used excessive force when restraining him on the gurney prior to his transport to Washington Hospital for evaluation.

**1. Plaintiff's Fourth Amendment - Warrantless Entry Claim**

It is undisputed that no warrant was obtained prior to the entry of any officer into Plaintiff's home. Generally, "[a] warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth Amendment warrant requirement applies, such as emergency, exigency, or consent." *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 533 (9th Cir. 2010). Defendants bear the burden of proving that their warrantless entry falls within an exception to the warrant requirement. *See Rodriguez v. City of San Jose*, 930 F.3d 1123, 1137 (9th Cir. 2019). Officers Gerber and Gigliotti move for summary judgment on the grounds that their entry was authorized under the emergency exception and Sergeant Little insists that his entry was justified under the emergency exception as well, or alternatively, that there was implied consent for his entry.

**a) Officers Gerber and Gigliotti's Entry**

Under the emergency exception, "if a police officer, while investigating within the scope necessary to respond to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would have been found." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (internal citation and quotation marks omitted). The emergency exception to the warrant requirement contains three requirements:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the

emergency with the area or place to be searched.

*Id*. (internal citation and quotation marks omitted). "The volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine because [w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning." *Id.* at 1164 (internal citation and quotation marks omitted).

The following facts are undisputed. Officers Gerber and Gigliotti responded to a 911 call regarding a domestic violence incident. (Dkt. No. 51-18 (Gigliotti Depo.) at 19:7-10; Dkt. No. 51-19 (Gerber Depo.) at 19:9-11.) Dispatch advised the officers that three adult Hispanic females and one adult Hispanic male were fighting and that the reporting party stated that her sister's boyfriend was "now trying to hit her mom and the [reporting party]." (Dkt. No. 51-21 at 4:15-5:16.) The officers were also advised that the boyfriend had been seen with a gun in the past. (*Id*. at 5:18-20.) Upon their arrival at the house, Officer Gigliotti spoke with the reporting party, Ellena, who stated that there had been an argument between her sister and Mr. Herrera and Mr. Herrera "was pushing her or pushing people inside the house," and that her sister was locked in a shed in the backyard "because she wanted to stay away from Rudi." (Dkt. No. 51-18 at 22:14-23:4.) Ellena's mother told Officer Gigliotti that she was concerned about the safety of the children in the house. (Dkt. No. 62-5 at 20:10-12.) Officer Gigliotti approached the house and attempted to look through the blinds which were drawn and he could see what looked like people moving around inside. (Dkt. No. 51-18 at 24:3-25.) Officer Gigliotti heard crying and yelling, and Officer Gerber heard a scream.[4] (Dkt. No. 51-18 at 25:2-21; Dkt. No. 51-19 at 26:7-10.) The officers then repeatedly knocked on the door, a woman opened the door, and she stated that her son and a woman had been

---

[4] Plaintiff insists that there is a dispute of fact regarding whether there was screaming and crying coming from the house; however, the only evidence Plaintiff cites to support his argument is the cellphone video which commences immediately before the officers enter the house. When the video starts, Plaintiff can be heard loudly instructing the woman standing at the door "don't unlock the door. No abres la puerta, ma. No." A male voice can then be heard asking what is going on, the woman opens the door, tells the officers at the threshold that her son and daughter are fighting, and the officers enter the house. Plaintiff himself did not testify regarding whether there was screaming and crying prior to the officers' entry. Accordingly, Plaintiff has not identified any evidence to dispute the officers' statements that they heard screaming and/or crying as they approached the house.

5

fighting. (Dkt. No. 51-18 at 34:8-17; Dkt. No. 51-19 at 36:8-14; Dkt. No. 62-4 (Esperanza Herrera Depo.) at 40:8-24.)

These facts are sufficient to establish that the officers were justified in entering the home without a warrant under the emergency exception. First, there were reasonable grounds to believe that an emergency was at hand and that people needed immediate assistance. Second, there is no evidence that the entry into the home was motivated by desire to conduct a search or arrest as opposed to ensure the safety of the reported victim and children that the officers were told were in the residence. Third, given Ellena's statement that the suspect was inside the house and that he had been seen with a gun the past, her mother's statement that she was worried for the safety of the children inside the house, Mr. Herrera's mother's statement regarding the fight when she opened the door, and that the officers did not know where the alleged victim was, there was probable cause to associate the emergency with the residence.[5] Under these circumstances, the officers had an "objectively reasonable basis for believing that an *actual or imminent injury* was unfolding in the place to be entered." *Bonivert v. City of Clarkston*, 883 F.3d 865, 877 (9th Cir. 2018) (emphasis in original); *see also Thomas v. Dillard*, 818 F.3d 864, 882 (9th Cir. 2016), as amended (May 5, 2016) (discussing that in domestic violence cases, the emergency exception could justify a warrantless entry where the facts suggested the situation was dangerous and uncertain).

Plaintiff responds that even if the emergency exception justified the initial entry, the exception does not last indefinitely and the officers unlawfully remained inside the residence. Plaintiff maintains that "[u]pon the officers' entry, there was no screaming or crying, the officers observed no physical injuries on the individuals inside and Plaintiff was kneeling on the ground with his back towards them" such that it was apparent that there was not a real emergency. (Dkt. No. 62 at 15:27-16:1.) However, audible crying can be heard on the video when the officers entered the house and the officers had not located Ms. Santellana —the alleged victim. While the emergency exception does not last indefinitely, it does last until the officers are able to determine whether there is an emergency. *See Thomas*, 818 F.3d at 883 (holding that based on conversations

---

[5] The Court reaches this conclusion even without crediting the officers' statements that they heard crying and screaming coming from inside as they approached the residence.

the officer had with both parties to the alleged domestic violence incident, a reasonable officer could not have believed that an emergency existed such that he was entitled to enter the home without a warrant); *see also United States v. Brooks*, 367 F.3d 1128, 1137 (9th Cir. 2004) (holding that exigent circumstances continued to justify an officer's investigation of a domestic violence incident even after victim told the officer she was unharmed because domestic violence victims often deny abuse while the abuser is present such that the officer's "decision to stay and ask more questions was a reasonable police procedure.") Plaintiff has not offered any evidence to support his theory that Officers Gerber and Gigliotti continued their investigation inside the residence after his arrest. *See Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996) (noting that it is not the court's task "to scour the record in search of a genuine issue of triable fact.").

In light of the undisputed facts, Officers Gerber and Gigliotti have established that the emergency exception justified their warrantless entry. At a minimum, the officers would at least be entitled to qualified immunity given the absence of any clearly established law saying that the emergency exception to a warrantless entry does not apply where: an officer is responding to a domestic violence call with a suspect who has been seen with a gun in the past, the officer is told by the reporting party (who is a minor) that the suspect hit her and her mother, the officer is told by the reporting party's mother that she is worried for the safety of the children in the house with the suspect, and where the location of the other alleged victim is unknown. Plaintiff's reliance on *Bonivert v. City of Clarkston*, 883 F.3d 865, 877 (9th Cir. 2018), is misplaced as there, "there were simply no circumstances pointing to an actual or imminent injury inside the home" because "[b]y the time the officers arrived, both [the victim] and the child were safely outside, surrounded by four other adults intent on protecting them from harm" and the officers had radioed dispatch to say there were no problems and everyone was safe. The undisputed facts here are to the contrary; in particular, Ms. Santellana's mother told the officers that she was concerned about the safety of the children inside with Plaintiff. No case holds, or even suggests, that officers cannot enter a home under the emergency exception when a domestic violence suspect is inside the home with children and a reporting party states her concern for the children.

Accordingly, Officers Gerber and Gigliotti are entitled to summary judgment on the

warrantless entry claim.

### b) Sergeant Little's Entry

Following Plaintiff's arrest, Sergeant Little arrived at the scene and entered Plaintiff's home as part of his post-incident investigation. Plaintiff insists that Sergeant Little's entry was unlawful because he never consented to Sergeant Little's entry into his home and any third-party consent was tainted by the officers' underlying illegal conduct. Sergeant Little counters that his entry was justified because the emergency exception was ongoing, he had implied consent to enter, no one asked him to leave, and he did not conduct any searches inside the house.

As noted above, warrantless entries into a home "are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 587 (1980); *see also Bonivert*, 883 F.3d at 874 ("there is no talismanic distinction, for Fourth Amendment purposes, between a warrantless entry and a warrantless search. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home.") (internal citation and quotation marks omitted). In addition to the emergency exception, "[t]he Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).

Defendants—as the party moving for summary judgment—bear the burden of offering evidence to negate Plaintiff's warrantless entry claim. The only evidence regarding Sergeant Little's presence in the house is his declaration testimony that he arrived at the scene to conduct a use of force/administrative investigation while Officers Gigliotti and Gerber were still conducting their investigation. (Dkt. No. 51-1 at ¶¶ 6-10.) When he arrived, Officers Gigliotti and Gerber gave him a briefing of what had occurred inside the house. (*Id.* at ¶ 8.) They were still conducting their investigation into the domestic disturbance call and interviewing witnesses. (*Id.* at ¶ 9.) Sergeant Little attests that "[w]e were still in the process of making sure everyone was safe and nobody needed medical attention." (*Id.*) As part of his investigation, Sergeant Little conducted interviews of witnesses inside and outside the home and no one asked him to leave. (*Id.* at ¶ 11.) He did not conduct any searches while he was inside the house. (*Id.* at ¶ 12.) These facts, though

not in dispute, are insufficient to meet Defendants' burden of showing that either the emergency or consent exceptions apply to justify Sergeant Little's warrantless entry.

However, even assuming that Sergeant Little violated Plaintiff's constitutional rights through his entry, he is entitled to qualified immunity. "In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). Here, the Court has concluded that Sergeant Little has not shown as a matter of law that he did not violate Plaintiff's constitutional rights through his warrantless entry into the home; thus, the dispositive question is whether that right was clearly established.

"[C]learly established law [is not to be defined] at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Instead, in deciding whether a constitutional right was clearly established at the time of the alleged violation, a court must ask "whether the violative nature of particular conduct is clearly established." *Id.* (emphasis added). "The plaintiff bears the burden to show that the contours of the right were clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), overruled on other grounds by *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Although this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, —— U.S. ——, 138 S.Ct. 1148, 1152 (2018). Qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id*

Plaintiff has pointed to no case—other than *Bonivert*—as establishing that the law was clearly established that the emergency exception does not cover a supervisor's entry into a home as part of an ongoing investigation into a domestic violence situation involving his subordinate officers who are still in the process of interviewing witnesses and victims and securing the scene. *Bonivert*, however, is distinguishable for the reasons stated above—while Sergeant Little arrived after Plaintiff had been arrested, he attests that the officers were still in the process of making sure

9

everyone was safe and nobody needed medical attention and thus the emergency was still arguably ongoing. Sergeant Little is entitled to qualified immunity unless "in the light of pre-existing law the unlawfulness [of his entry] must be apparent." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Plaintiff has pointed to no law which makes it apparent that Sergeant Little's entry was unlawful under the "particularized" facts here. *Id*.

Accordingly, Sergeant Little is entitled to summary judgment on the unlawful entry claim.

### 2. Plaintiff's Fourth Amendment – Unlawful Detention Claim

Plaintiff's unlawful detention or seizure claim is two-fold: first, that Officers Gigliotti and Gerber lacked probable cause to search him for weapons, and second, that they lacked probable cause to arrest him. The first argument is easily disposed of—the same undisputed facts which justify the officers' warrantless entry into Plaintiff's home constitute probable cause to search his person for a weapon; namely, that officers were responding to a report of a domestic disturbance, it had been reported that Plaintiff pushed and grabbed people, that he had been seen with a gun in the past, the officers were told that Plaintiff had hit the reporting party and her mother, the mother reported that she was afraid for the safety of the children in the house, the woman who opened the door said that her son had been fighting with a woman, and when the officers entered the house several women and children were present along with the suspect.

With respect to probable cause for arrest, the standard is somewhat different. "A claim for unlawful arrest is cognizable under [42 U.S.C.] § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City and Cnty of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Id*. at 966. In the context of an unlawful arrest, "the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is reasonably arguable that there was probable cause for arrest–that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cnty*., 663 F.3d 1071, 1076 (9th Cir. 2011) (per curiam).

Officers Gigliotti and Gerber insist that they had probable cause to arrest Plaintiff for a violation of California Penal Code Sections 148 (resisting arrest) and 243 (battery) because of "his admitted movement away from the officers and his physical resistance to handcuffing.[6]"  In their reply brief, Defendants also insists that Ellena and her mother's statements to the 911 dispatcher and the officers on scene established probable cause to arrest Plaintiff for a violation of Penal Code 243(e)(1) (battery on a spouse or domestic partner).

Plaintiff contends without explanation that probable cause for the battery could only have been established—if at all—after Plaintiff's arrest.  Plaintiff also maintains that a reasonable juror could find that the officers manufactured probable cause to arrest Plaintiff because Officer Gigliotti who was "unprovoked[] forcibly grabbed Plaintiff's arms from above his head in an attempt to separate them and bring them down behind his back."  (Dkt. No. 62 at 18:21-22.)  Plaintiff insists that "[i]t is undisputed that Plaintiff was voluntarly submissive and compliant" and that "[v]ideo evidence supports this conclusion."  (*Id.* at 18:23-24.)

The Court need not address whether there was probable cause to arrest Plaintiff for resisting arrest because there is no dispute of material fact as to whether there was probable cause to arrest Plaintiff for battery on a spouse or domestic partner under Section 243(e)(1).  *See* CALJIC No. 16.140.1 (setting forth the elements of a violation of section 243(e)(1): "1. A person used force or violence upon (name of alleged victim); 2. The use was willful [and unlawful]; and 3. At the time of the use of force or violence, (name of alleged victim) was [[his] [her] (required relationship)] [an individual with whom the defendant currently has, or has previously had, a dating or engagement relationship]".).  It is undisputed that the officers had been advised that a fight occurred at Plaintiff's residence, Plaintiff had grabbed his girlfriend during the fight, the reporting party (a minor) advised the officers Plaintiff had hit her and her mother, the woman who opened the door told the officers her son and another woman had been fighting, and Plaintiff matched the description of the responsible party.

---

[6] Defendants' motion for summary judgment and Plaintiff's opposition refer to Penal Code Section 273 (paying or receiving a thing of value for the placement or consent to adoption of a child) rather than Penal Code Section 243(b) (battery on a police officer). The Court assumes the reference to Section 273 was a typographical error.

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (internal citation omitted). This is an objective, rather than subjective standard. *Id.* The officers here had an objectively reasonable basis for arresting Plaintiff for a violation of Penal Code § 243(e)(1) based on the totality of the circumstances known to them at the time of his arrest.

Accordingly, Defendants' motion for summary judgment on the unlawful detention and arrest claim is granted.

### 3. Plaintiff's Fourth Amendment – Excessive Force Claim

Whether a defendant's use of force was "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Thus, the question is "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. In making that determination, courts consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 2472 (2015) (citing *Graham*, 490 U.S. at 296). These factors are not exclusive; instead, courts should consider all of the circumstances it deems relevant. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This determination is normally a question for the jury because it requires "resolution of disputed questions of fact and determinations of credibility, as well as on the drawing of inferences." *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002) ("[E]xcessive force claims

typically boil down to an evaluation of the various accounts of the same events. Thus, the circumstances surrounding those events may be critical to a jury's determination of where the truth lie."). Summary judgment may be appropriate, however, when the facts concerning an incident are largely undisputed. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("[D]efendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.").

Plaintiff's excessive force claim is based on two separate uses of force: (1) Officers Gerber and Gigliotti's use of force to handcuff him, and (2) Officer Francisco's use of force while Plaintiff was being restrained on the gurney following his arrest. Disputes of fact preclude summary judgment based on either use of force.

### a) Officers Gerber and Gigliotti's use of force

Officers Gerber and Gigliotti's version of events after they entered the house is consistent. Both officers observed three to four people in the room including at least one child. (Dkt. No. 51-18 at 30:5-7; Dkt. No. 51-19 at 36:15-18.) One of the individuals was a man who matched the description given to the officers by dispatch. (Dkt. No. 51-19 at 36:24-37:1.) He was kneeling in front of a young child with his back to the officers. (*Id*. at 37:3-4; Dkt. No. 51-18 at 34:18-23.) The child was crying. (Dkt. No. 51-18 at 34:22.) The man—later identified as Mr. Herrera—was handing the child a cellphone and telling him to record everything. (*Id*. at 34:23-25.) Officer Gigliotti was concerned about the safety of the kids and of Melissa, because he did not know if Mr. Herrera had a gun, his back was toward him, and he could have had a gun hidden on his person or in the residence. (*Id*. at 35:24-36:4.) As the officers entered the room, Mr. Herrera stood up and Officer Gerber heard Mr. Herrera say "I didn't give you permission" in a loud and aggressive manner. (Dkt. No. 51-19 at 38:3-13.) Officer Gerber stated that they needed to check on the welfare of everyone inside. (*Id*. at 47:8-13.) Mr. Herrera turned his back to the officers and put his hands behind his head locking his fingers which Officer Gigliotti understood to mean that Mr. Herrera was giving him consent to conduct a pat search for weapons. (Dkt. No. 51-18 at 36:14-19.) However, while Mr. Herrera "began to voluntarily consent to [a pat search], he did not

let [Officer Gigliotti] perform [his] pat-down search." (*Id*. at 40:23-34.)  Instead, Mr. Herrera

tensed up and pulled his hands a part. (*Id*. at 42:12-15.)  As a result, Officer Gigliotti attempted to

grab his arms to try to bring them down to handcuff him, but Mr. Herrera physically resisted his

efforts. (*Id*. at 42:17-23.)  Officer Gerber, who was covering Officer Gigliotti as he attempted to

conduct the pat down, testified that at that point "hands got ripped, fists got clenched, and he

became aggressive." (Dkt. No. 51-19 at 50:11-12.)

Each officer then moved to take control of one of Mr. Herrera's arms because they needed

to detain him until they could determine if there were any weapons and investigate the domestic

violence report. (*Id*. at 52:12-53:5; 57:9-12.)  In doing so, the officers got Mr. Herrera against the

wall and tried to get his hands behind his back to handcuff him, but Mr. Herrera was tense, pulling

his arms away, and growling. (Dkt. No. 51-18 at 47:15-24.)  The officers told Mr. Herrera to calm

down and relax. (*Id*. at 47:18.)  Because Mr. Herrera was actively resisting, Officer Gerber

removed his taser from its holster. (Dkt. No. 51-19 at 57:16-22.)  Officer Gerber warned Mr.

Herrera several times that if he did not calm down he would use the taser. (*Id*. at 60:24-25.)

Officer Gigliotti then spun Mr. Herrera off the wall and onto the couch, but he was still struggling

with them and would not let them handcuffs him. (Dkt. No. 51-18 at 48:17-23.)  According to

Officer Gigliotti, it felt like Mr. Herrera was "trying to get free so he could fight us." (*Id*. at

49:13-14.)  Officer Gerber felt that Officer Gigliotti was in a vulnerable position struggling with

Mr. Herrera on the couch. (Dkt. No. 51-19 at 62:8-16.)  Officer Gerber deployed his taser

because they needed to "safely detain him in handcuffs because he had been fighting with us."

(*Id*. at 66:7-14.)  The situation was "unbelievably chaotic" there were people in the room

"screaming and yelling." (*Id*. at 66:16-18.)  The taser was deployed in probe mode and appeared

to have a "good effect" because Mr. Herrera stopped moving and Officer Gigliotti was able to get

a better hold on Mr. Herrera's right arm and hand. (*Id*. at 72:3-16.)  Although Mr. Herrera was

holding his hands together, the officers were unable to handcuff him because he was pushing his

hands against his body and squeezing his arms such that the officers could not handcuff him.

(Dkt. No. 51-18 at 53:22-54:19.)  Because Mr. Herrera continued to resist, Officer Gerber gave

him another warning and deployed the taser again when Mr. Herrera did not respond to the

warning.  (Dkt. No. 51-19 at 74:1-13.)  The officers were ultimately able to handcuff Mr. Herrera, but he was still being violent and pushing back on Officer Gigliotti so he stuck Mr. Herrera the upper back area to subdue him.  (Dkt. No. 51-18 at 52:18-21.)  The officers then led Mr. Herrera out of the house.

According to Mr. Herrera, after the argument in the backyard, Melissa went to the shed and he went into the house with his mom and the kids.  (Dkt. No. 51-13 at 135:16-20.)  He was aware that the police were called because he saw flashing lights although he did not know why they were there.  (*Id*. at 135:8-12.)  At some point, he closed the door "barricading myself for my safety and the safety of my children." (*Id*. at 139:4-13; 143:7-13.)  He recalls the police yelling instructions and banging on the door.  (*Id*. at 142:17-25.)  His mother opened the door.  (*Id*. at 146:10-17.)  The officers then "rushed in house," "immediately saw [him] and came straight towards [him]," and he put his hands over his head.  (Dkt. No. 62-2 at 147:19-148:1; 150:17.)  He allowed the officer to complete his pat down search, but then the officer "escalated things so I don't know what happened from there." (*Id*. at 153:24-154:24.)  He remembers one of the officers moving his hands away from his head to behind his back and in response Mr. Herrera "moved away." (*Id*. at 155:1-13.)  The officers then threw Mr. Herrera to the ground, started beating him up, choking him, and tasing him in front of his kids. (*Id*. at 155:20-25.)  He cannot remember the specifics he "just remember[s] them throwing me all over the house, you know, just having my –putting me against the wall like you said and I just remember getting thrown around like a rag doll." (*Id*. at 156:18-21.)

*** 

The following disputes of fact preclude summary judgment: (1) whether the officers were able to complete their pat down search for weapons; (2) whether Plaintiff was compliant with the officers' instructions; (3) whether Plaintiff resisted or fought with the officers as they tried to handcuff him; and (4) the extent of the warning before Plaintiff was tased.  The cellphone video of the incident does not preclude a finding of a dispute of material fact.  First, the video is obscured for much of the incident, including the part immediately before and during both taser deployments.  Thus, the Court must accept Plaintiff's version of events as true; that is, that he

allowed the officers to complete their pat down search, that he was compliant, and that the officers threw him on the ground, choked him, beat him up, and tased him. Based on these facts, the Court cannot find that the force the officers used was reasonable as a matter of law. Second, "[t]he mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018), cert. denied sub nom. *City of Newport Beach, Cal. v. Vos*, 139 S. Ct. 2613 (2019). Here, reasonable jurors could draw different inferences from the officers and Mr. Herrera's conduct during the incident. Summary judgment on the excessive force claim as to Officers Gerber and Gigliotti is therefore improper.

**b) Officers Gerber and Gigliotti's Claim of Qualified Immunity**

These disputes of fact also preclude the Court from finding that the officers are entitled to qualified immunity. "In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). The Court must accept Plaintiff's version of facts as true which would support a finding that his Fourth Amendment right to be free from excessive force was violated. The Court thus turns to the question of whether that right was clearly established at the time of the incident.

As previously noted, "clearly established law [is not to be defined] at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "Although this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, ⸺ U.S. ⸺ ⸺, 138 S.Ct. 1148, 1152 (2018). Qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

At the time of this incident, the Ninth Circuit's most recent guidance on the use of a taser was *Thomas v. Dillard*, 818 F.3d 864 (9th Cir. 2016), wherein an officer responded to a report of domestic violence at a college campus. *Id.* at 872. The officer there used his taser on a domestic violence suspect who refused to allow himself to be searched, but who gave "no indication he was

16

going to flee, and his resistance was mostly passive." *Id*. at 890. The Ninth Circuit found that the use of a taser in dart mode under these circumstances was unreasonable, but granted qualified immunity because under the law at the time of the incident "it would not have been apparent to an officer in Dillard's shoes that using a taser on a domestic violence suspect refusing to allow a frisk—whom the officer reasonably but mistakenly believed could be frisked—constituted excessive force." *Id*. at 891. This incident post-dates *Thomas* and a reasonable officer would have been on notice that using a taser under the facts as alleged by Plaintiff—on a suspect who consented to search, did not actively resist the officers, and did not attempt to flee—was unreasonable. Accordingly, the Court likewise denies summary judgment on Officers Gerber and Gigliotti's claim of qualified immunity.

### c) Officer Francisco's Use of Force

Plaintiff also contends that Officer Francisco used excessive force when he choked him while Plaintiff was on the gurney before he was transported to the hospital. As with the other excessive force incident, the parties' version of events sharply diverge.

According to Officer Francisco, he was assisting the medical personal transferring Mr. Herrera from the squad car to the gurney to be taken to the hospital for an evaluation. (Dkt. No. 51-2 (Francisco Decl.) at ¶ 9.) However, Mr. Herrera was "still thrashing around and resisting" and they had to take his handcuffs off to get him on the gurney. (*Id*.) To try to subdue Mr. Herrera, Officer Francisco used a "simple pain compliance or pressure point technique" where he "placed [his] right hand underneath [Mr. Herrera's] jaw with [his] fingers applying pressure to the hypoglossal nerve to control his upper body so that [they] could get his hands into the restraints on the gurney." (*Id*. at ¶ 10.) According to Mr. Herrera, however, "Officer Francisco [was] choking me, really tight, has a tight squeeze around my neck" as someone said "stop it or I'm going to break your neck." (Dkt. No. 62-2 at 168:11-169:12.)

Because there is a factual dispute, the Court must accept Plaintiff's version of events as true: that Officer Francisco attempted to choke him while he was in restraints on the gurney. The Court cannot hold that Officer Francisco's use of such force was reasonable as a matter of law or find that Officer Francisco is entitled to qualified immunity for such a use of force. *See*

*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("The officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable.")

Officer Francisco's motion for summary judgment on Plaintiff's excessive force claim is therefore denied.

### 4. Plaintiff's First Amendment Retaliation Claim

To state a First Amendment retaliation claim, a plaintiff must show "that (1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (quoting *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)). To ultimately "prevail on such a claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett*, ⸺ U.S. ⸺, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 259 (2006)). In particular, a plaintiff must show that the defendant's retaliatory animus was "a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (quoting *Hartman*, 547 U.S. at 260).

Plaintiff contends that he engaged in two constitutionally protected activities: (1) slamming the front door when the officers arrived at his residence, and (2) instructing his younger brother to record the incident. (Dkt. No. 62 at 21:1-4.) Even if the Court were to accept Plaintiff's unsupported contention that these activities constitute protected speech, Plaintiff has failed to demonstrate a nexus or causal connection between the protected activity and the officers' actions. Nor can he in light of the Court's conclusion that probable cause supported Plaintiff's arrest. *See Nieves*, 139 S. Ct. at 1724 ("plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest.). Plaintiff's oral argument suggestion that the officers used excessive force in retaliation for Mr. Herrera instructing his younger brother to video the officers is not plausible given the totality of the undisputed circumstances. Further, to the extent

Plaintiff alleges that the claim is based on Sergeant Little "wrongly attempt[ing] to intimidate Esperanza into giving him video footage," Plaintiff has offered no evidence of an interaction between Sergeant Little and Esperanza which could give rise to such a claim.  (Dkt. No. 62 at 21:7-8.) *See Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996) (noting that it is not the court's task "to scour the record in search of a genuine issue of triable fact.").

Accordingly, Defendants' motion for summary judgment on Plaintiff's Section 1983 First Amendment claim is granted.

### 5. Plaintiff's Fourteenth Amendment Claim

Plaintiff's first claim for relief alleges violation of the First, Fourth, and Fourteenth Amendments. The basis for Plaintiff's Fourteenth Amendment claim is, however, unclear.  To the extent that it is based on the alleged unlawful entry, detention, and use of force, the Fourth Amendment is the proper vehicle for raising those claims.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (concluding "that all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach"); *Godoy v. Cty. of Sonoma*, No. 15-CV-00883-WHO, 2016 WL 269867, at *4 (N.D. Cal. Jan. 22, 2016) ("To the extent plaintiffs' alleged Fourteenth Amendment violations are based on the officers' use of excessive force, they must be analyzed under the Fourth Amendment standard.").  To the extent, Plaintiff's Fourteenth Amendment claim gives rise to his *Devereaux* claim, that claim is separately pled and analyzed below.

Accordingly, Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment claim as pled in the first claim for relief is granted.

***

For the reasons stated above, the Court grants Defendants' motion for summary judgment on Plaintiff's first claim for relief except as to the excessive force claim against Officers Gerber, Gigliotti, and Francisco.  While this claim was also brought against the City and Chief of Police Lucero, Plaintiff has failed to raise any argument against the Defendants' motion for summary judgment on the first claim for relief as to them.  To the extent that Plaintiff seeks to plead a

Section 1983 claim against the City, such a claim is considered under Plaintiff's second claim for relief for *Monell* liability.

**B.    Plaintiff's Section 1983 *Monell* and Supervisory Liability Claim – Second Claim**

**1.    *Monell* Liability**

Municipalities are "persons" under Section 1983 and thus may be liable for causing a constitutional deprivation. *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978). A municipality, however, may not be sued under Section 1983 solely because an injury was inflicted by its employees or agents; instead, the entity is responsible only when execution of a government's policy or custom inflicts the injury. *Id.* at 694. To impose municipal liability under Section 1983 for a violation of constitutional rights, a plaintiff must show: (1) the plaintiff possessed a constitutional right of which he or she was deprived; (2) the municipality had a policy; (3) the policy amounts to a deliberate indifference to the plaintiff's constitutional rights; and (4) the policy is the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. No. 40, Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

Given the Court's conclusion that fact questions exist as to whether Officers Gerber, Gigliotti, and Francisco violated Plaintiff's Fourth Amendment rights, the first factor is met here. As for the second factor, to establish a policy, custom, or practice a plaintiff must show: (1) an unconstitutional custom or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train; or (3) a final policy-maker's involvement in, or ratification of, the unconstitutional decision or action and the basis for it. *See Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), overruled on other grounds by *Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Here, Plaintiff appears to contend that *Monell* liability exists under all three bases. First, Plaintiff insists that the City's job performance evaluation process incentivizes unconstitutional behavior. In particular, Plaintiff identifies a document attached as Exhibit P to the Kim Declaration which he argues shows that Fremont police officers are evaluated on the number of citations and arrests made within a certain time period, the number of cases sent to the District Attorney's office, and the percentage charged within the same time period. (Dkt. No. 62-17.)

Plaintiff contends that this evaluation process incentivizes officers to "effectuate every arrest they make, whether constitutional or not" and "to write corresponding policy reports, whether accurate or not, to successfully support charged being brought against arrestees." (Dkt. No. 62 at 23:13-15.) There is, however, no evidence to support Plaintiff's theory. Even if the Court were to accept that this incomplete, heavily redacted, and unauthenticated document represents the Fremont Police Department Police Officer Evaluation process for the relevant time period, it does not show what the City's policy is with respect to tying an employee's job evaluation to metrics regarding citations, arrests, and prosecutions; that is, Plaintiff has not offered any evidence as to how the number of citations, arrests, or prosecutions is weighted or calculated in an employee's evaluation or how these statistics affect an employee's performance evaluation at all. Plaintiff has also failed to show how any such policy regarding performance evaluations is causally connected to his constitutional injury or that the policy was the moving force behind any of the officers' conduct here. *See Castro*, 833 F.3d at 1076.

Second, Plaintiff insists that "it is evident that FPD failed to train Officers Gigliotti, Gerber, and Francisco" based on the fact that (1) the taser policy prohibits use of a taser on a restrained or handcuffed individual; (2) the taser policy does not recommend multiple applications of the taser; (3) policy prohibits "suppressing, concealing, or distorting facts"; (4) policy requires warrants to arrest individuals in their homes absent exigent circumstances; and (5) there is no policy for "other pain compliance holds." (Dkt. No. 62 at 24:13-24.) However, Plaintiff has failed to identify what was inadequate about the training the officers received such that the failure to train was deliberately indifferent to Plaintiff's constitutional rights or a moving force behind the constitutional violations. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("[I]t is therefore difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate."); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the

police come into contact.").

Finally, Plaintiff's ratification argument is based on the alleged performance evaluation policy; that is, because Chief Lucero signs off on the performance evaluations he has ratified the unconstitutional behavior of law enforcement officers. This argument fails because as discussed *supra*, Plaintiff has not established that there was an unconstitutional policy regarding the evaluations that was the moving force behind the alleged constitutional violations here.

Accordingly, Plaintiff has failed to establish a basis for *Monell* liability and Defendants' motion for summary judgment on this claim is granted.

### 2. Supervisory Liability

Plaintiff also seeks to hold Chief Lucero and Sergeant Little liable based on a supervisory liability theory. However, there is no respondeat superior or vicarious liability under Section 1983. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A supervisor is liable only when he or she has directly participated in or proximately caused the alleged deprivation. *See Palmer v. Sanderson*, 9 F.3d 1433, 1437-38 (9th Cir. 1993). Under Section 1983, a supervisor may be held liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citation and internal quotation marks omitted). The requisite causal connection may be shown by the supervisor's "own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1208.

Plaintiff has not identified any evidence that would support a finding that Chief Lucero was personally involved in or had any causal connection to the constitutional violations alleged here beyond the ratification argument which the Court rejected *supra*. As to Sergeant Little, Plaintiff states without explanation that Sergeant Little is liable because he unlawfully entered Plaintiff's residence, failed to complete a Blue Team entry, failed to ensure photographs were taken of Plaintiff's injuries, and failed to review and approve all related reports. (Dkt. No. 62 at 25:24-26:2.) Plaintiff, however, has failed to show a causal connection between these actions and

the constitutional violations alleged here.

Defendants' motion for summary judgment on Plaintiff's supervisory liability claim is therefore granted.

## C.    Plaintiff's Section 1983 *Devereaux* Claim—Third Claim

"A *Devereaux* claim is a claim that the government violated the plaintiff's due process rights by subjecting the plaintiff to criminal charges based on deliberately-fabricated evidence." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). "To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (internal citation omitted).  For purposes of causation under the second element, the plaintiff must establish that "(a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the 'proximate cause' or 'legal cause' of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Id.* (internal citation omitted).  Defendants move for summary judgment on the grounds that the evidence is insufficient for Plaintiff to meet his *Devereaux* claim burden.

Plaintiff's opposition states in its entirety in support of this claim:

> Video evidence directly contradicts the officers' police reports, which the officers deliberately fabricated to justify their unlawful entry, seizure, use of force, and arrest. Specifically, the officers perjured facts including, but not limited to: Plaintiff slamming the front door shut; continuous screaming and crying; Esperanza opening the screen door; Plaintiff resisting the pat-down search; Plaintiff attempting to flee; and Plaintiff being violent and pushing back.

(Dkt. No. 62 at 26.)  Plaintiff cannot meet his summary judgment burden by merely generally citing to "video evidence."  For example, the cellphone video itself without reference to any other evidence does not support a finding that the officers fabricated any of the statements Plaintiff identifies.  Further, and more fatefully, the cellphone video does not establish that Plaintiff was prosecuted *because of* these statements. *See Spence*, 857 F.3d at 800 (holding that for a deliberate fabrication claim the plaintiff must "demonstrate that the defendant's conduct was the actionable

cause of the claimed injury. To meet this causation requirement, the plaintiff must establish both causation-in-fact and proximate causation.") (internal citation and quotation marks omitted). Generally, there is a rebuttable presumption of prosecutorial independent judgment. *See Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018). Plaintiff has not offered any evidence to rebut the presumption of prosecutorial judgment; that is, evidence that the prosecutor considered the allegedly fabricated evidence when making the charging decision. *Id*. at 117 ("A prosecutor's judgment cannot be said to be independent where the prosecutor considers potentially fabricated evidence without knowing that the evidence might be fundamentally compromised and misleading."). The cellphone video—the only evidence Plaintiff cites in support of this claim— does not support any inference as to the prosecutor's charging decision.

Given Plaintiff's failure to offer any evidence in support of the second element of his *Devereaux* claim, Defendants are entitled to summary judgment on this claim.

**D.      Plaintiff's Section 1983 Malicious Prosecution Claim – Fourth Claim**

To prevail on a section 1983 malicious prosecution claim, a plaintiff must prove that criminal proceedings were instituted with malice, without probable cause, and for the purpose of denying the plaintiff a specific constitutional right. *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995). The claim "requires 'the institution of criminal proceedings against another who is not guilty of the offense charged' and that 'the proceedings have terminated in favor of the accused.'" *Lacey v. Maricopa Cty*., 693 F.3d 896, 919 (9th Cir. 2012) (quoting Restatement (Second) of Torts § 653 (1977)).

Plaintiff's malicious prosecution claim is based on Officer Gigliotti's recommendation that Plaintiff be charged with Section 148 and Section 237.[7]  (Dkt. No. 62 at 27: 13-15.)  Plaintiff insists there was not probable cause for these charges "because the officers manufactured probable cause for the resistance and because Melissa stated Plaintiff never pushed her or put his hands on her." (*Id*. at 27:17-18.)  Plaintiff also states that "Officer Gigliotti admitted there probably was no

---

[7] The Court assumes this is a typographical error in Plaintiff's brief and instead refers to Section 243(e)(1) because there is no reference to Section 237 in Officer Gigliotti's report. (Dkt. No. 62-10 at 15.)

probable cause" citing to a dash cam video. (*Id.* at 27:18-19 (citing Exhibit O at 0:08-0:25).) Plaintiff's arguments fail to raise a dispute of material fact.

First, the Court has held that probable cause supported Plaintiff's arrest for a violation of Section 243(e)(1). Second, Plaintiff has cited to no evidence in support of his theory that the officers "manufactured probable cause for resistance" nor has Plaintiff provided evidence in support of Melissa's alleged statement; indeed, the evidence in the record—Melissa's deposition—is that she does not remember what happened beyond that there was an argument and yelling. (Dkt. No. 62-3 at 22:4-25:4.) *See Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996) (noting that it is not the court's task "to scour the record in search of a genuine issue of triable fact."). Finally, even if there was a question of fact as to whether there was probable cause for the arrest for resisting arrest, Plaintiff has not shown that the charging recommendation was made for the purposes of denying him equal protection or another specific constitutional right. *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1069 (9th Cir. 2004) ("a § 1983 malicious prosecution plaintiff must prove that the defendants acted for the purpose of depriving him of a 'specific constitutional right'") (quoting *Freeman*, 68 F.3d at 1189). Indeed, Plaintiff has not even identified a constitutional right which the Defendants allegedly conspired to deny him of; rather, Plaintiff argues that the charging recommendation was made to maintain Officer Gigliotti and "Officer Gerber's high percentage score [on their performance evaluations] and for want of probable cause to legitimize their illegal conduct." (Dkt. No. 62 at 27:19-21.) But this argument is circular and does not tie the allegedly false charging recommendation to a deprivation of Plaintiff's constitutional rights.

Accordingly, Plaintiff has failed to demonstrate any basis for his malicious prosecution claim and Defendants' motion for summary judgment is granted.

## II. <u>Plaintiff's State Law Claims</u>

### A.      <u>Plaintiff's Bane Act Claim – Sixth Claim</u>

The Bane Act provides a private right of action against a person who interferes by "threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or

laws of the United States, or of the rights secured by the Constitution or laws of this state...." Cal. Civ. Code § 52.1. "There are two distinct elements for a section 52.1 cause of action. A plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015), as modified on denial of reh'g (Mar. 6, 2015), review denied (May 20, 2015) (citations omitted).

Defendants insist that summary judgment is appropriate because there is no evidence that Plaintiff's rights were violated by Defendants' violence or a threat of violence. Not so. The Court has denied Defendants' motion for summary judgment on the excessive force claim. "A successful claim for excessive force under the Fourth Amendment provides the basis for a successful claim under § 52.1." *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014).

Accordingly, Officers Gerber, Gigliotti, and Francisco are not entitled to summary judgment on Plaintiff's Bane Act claim which is predicated on the same facts as his excessive force claim. *See Barragan v. City of Eureka*, No. 15-CV-02070-WHO, 2016 WL 4549130, at *8 (N.D. Cal. Sept. 1, 2016) (denying summary judgment on a Bane Act claim because "an excessive force claim by its nature includes coercion beyond that inherent, for example, in an arrest or detention or search and seizure" and collecting cases re: the same).

**B.       Plaintiff's Remaining State Law Claims**

Defendants contend they are entitled to summary judgment on Plaintiff's remaining state law claims—for unreasonable search and seizure under Article 1, Section 13 of the California Constitution (fifth claim), for assault and battery (seventh claim), false imprisonment/arrest (eighth claim), negligence (ninth claim), and invasion of privacy (tenth claim)—because these claims duplicate Plaintiff's Section 1983 and Bane Act Claims. Because the Court has denied summary judgment on the Section 1983 and Bane Act claims as to Plaintiff's excessive force claim against Officers Gerber, Gigliotti, and Francisco, summary judgment must necessarily be denied as to them on the unreasonable search and seizure, assault and battery, negligence, and invasion of privacy claims to the extent they are based on the alleged excessive force. However,

summary judgment is granted on Plaintiff's false imprisonment/arrest claim for the same reasons the Court grants summary judgment on Plaintiff's Section 1983 unlawful arrest claim.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is denied as to Plaintiff's Section 1983 excessive force claim against Officers Gerber, Gigliotti, and Francisco, and his state law claims predicated on this same constitutional violation. The motion is granted in all other respects.

This Order disposes of Docket No. 51.

**IT IS SO ORDERED.**

Dated: November 13, 2019

JACQUELINE SCOTT CORLEY
United States Magistrate Judge